```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| In re:<br><br>NICKELS MIDWAY PIER, LLC<br><br>             Debtor.<br><br>NICKELS MIDWAY PIER, LLC;<br>JOHN NICKELS; ANGELO NICKELS;<br>and STEVEN NICKELS,<br><br>             Appellants,<br><br>    v.<br><br>WILD WAVES, LLC,<br><br>             Appellee. | HONORABLE JOSEPH E. IRENAS<br>     CIVIL ACTION<br>    NO. 10-6617 (JEI)<br><br>BANKRUPTCY NO. 03-49462(GMB)<br><br>**OPINION** |

**Appearances**:

TEICH GROH
By: Brian W. Hofmeister, Esq.
691 State Highway 33
Trenton, New Jersey 08619
    Counsel for Nickels Midway Pier, LLC

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
By: Fredric R. Cohen, Esq.
Fairway Corporate Center
4300 Haddonfield Road
Pennsauken, New Jersey 08109
    Special Litigation Counsel for Nickels Midway Pier, LLC

ARCHER & GREINER, P.C.
By: Jerrold S. Kulback, Esq.
One Centennial Square
Haddonfield, New Jersey 08033
    Counsel for John, Steven and Angelo Nickels

HORNSTINE WERTHEIMER & PELLONI, LLC
By: Louis F. Hornstine, Esq.
1518 Walnut Street, Suite 1600

Philadelphia, Pennsylvania 19102
    Counsel for John, Steven and Angelo Nickels

COZEN O'CONNOR
By: Arthur J. Abramowitz, Esq.
Jerrold N. Poslusny, Jr., Esq.
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, New Jersey 08002
    Counsel for Wild Waves, LLC


FORD, FLOWER & HASBROUCK
By: Willis F. Flower, Esq.
Central Square
New Road & Central Avenue, Suite 42A
P.O. Box 405
Linwood, New Jersey 08221
    Counsel for Wild Waves, LLC

**IRENAS**, Senior District Judge:

    This matter comes before the Court on the appeal of Debtor Nickels Midway Pier, LLC ("Nickels") and John, Steven and Angelo Nickels ("the Nickels Brothers")[1], from the Bankruptcy Court's order of December 13, 2010, confirming Wild Waves, LLC's ("Wild Waves") Third Modified, First Amended Plan for Liquidation ("the Plan").  For the reasons that follow, the Court will affirm.

**I.**

    Both Nickels (the debtor) and Wild Waves proposed plans of

---

[1] The Court will refer to Nickels and the Nickels Brothers collectively as "Nickels" unless otherwise indicated.

reorganization,[2] but ultimately, the Bankruptcy Court confirmed Wild Waves' plan.[3]  The instant appeal concerns three aspects of the Plan.

First, the Plan provides that Nickels will assume, pursuant to 11 U.S.C. § 1123(b)(2), the contact of sale ("Sale Agreement"), wherein Nickels agreed to sell its principal asset (an amusement pier in Wildwood, New Jersey) to Wild Waves.  For reasons to be explained *infra*, the Bankruptcy Court determined that the appropriate purchase price for the Pier, pursuant to the Sale Agreement, was $3,051,380.

Second, the Plan treats the Nickels Brothers, the sole

---

[2]  After the exclusive period in which only the debtor may file a plan, *see* 11 U.S.C. § 1121(b), "[a]ny party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan."  11 U.S.C. § 1121(c).

[3]  The parties' related disputes in and out of the instant bankruptcy suit, and the appeals of those disputes, are too numerous to cogently discuss in any one opinion.  Thus, the instant opinion only contains the facts most relevant to the issues raised by the instant appeal. Additional discussions of the facts and procedural history of this case, and related litigation, may be found at *Nickels Midway Pier, LLC v. Wild Waves, LLC,* 341 B.R. 486 (D.N.J. 2006), *aff'd* 255 F.App'x 633 (3d Cir. 2007);  *Nickels Midway Pier, LLC v. Wild Waves, LLC,* 372 B.R. 218 (D.N.J. 2007); *In re: Nickels Midway Pier, LLC (Nickels Midway Pier, LLC v. Wild Waves, LLC),* 383 B.R. 595 (D.N.J. 2008), *aff'd* 348 F.App'x 781 (3d Cir. 2009); *In re: Nickels Midway Pier, LLC,* 2010 WL 415328 (D.N.J. Jan. 28, 2010); *Scottsdale Ins. Co. v. Weiner*, 2010 WL 445649 (D.N.J. Feb. 1, 2010); *In re: Nickels Midway Pier, LLC (Nickels Midway Pier, LLC v. Wild Waves, LLC*), 2010 WL 3881376 (D.N.J. Sept. 28, 2010).

equity interest holders, as having "unimpaired"[4] interests because the Nickels Brothers will retain their equity interests and will receive a distribution in the event there are funds available from the liquidation of the Debtor's assets after payment of all creditors.

Third, the Plan, pursuant to 11 U.S.C. § 1122(a), classifies Wild Waves as the only impaired interest, thereby giving Wild Waves, the Plan proponent, the sole vote to confirm the Plan.[5]

## II.

The District Court has jurisdiction to hear appeals from final judgments, orders and decrees of the Bankruptcy Court in cases and proceedings referred pursuant to 28 U.S.C. § 157(a) to the Bankruptcy Court.  28 U.S.C. § 158(a).

The District Court reviews *de novo* the legal determinations of the Bankruptcy Court. *In re: Jersey City Medical Center*, 817 F.2d 1055, 1059 (3d Cir. 1987).  The Bankruptcy Court's factual determinations will be left undisturbed on appeal unless they are clearly erroneous.  Fed. R. Bankr. P. 8013.

---

[4] *See* 11 U.S.C. § 1124(1) ("a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan--(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.")

[5] *See* 11 U.S.C. § 1126, governing "acceptance of plan."

4

**III.**

Nickels asserts four arguments: (1) Wild Waves' Plan provision in which Nickels assumes the Sale Agreement violates the Bankruptcy Code; (2) the Bankruptcy Court erred in determining the purchase price for the Pier; (3) the Nickels Brothers are impaired; and (4) Wild Waves improperly gerrymandered creditor classes so that it could have the sole vote to confirm its own Plan.

The Court addresses each argument in turn.

**A.**

Nickels asserts that the Bankruptcy Code only allows the trustee and debtors in possession to assume executory contracts, i.e., a party in interest[6] plan proponent cannot force a debtor to assume an executory contract.

The relevant provision states, "a plan may– . . . (2) subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract . . . of the debtor not previously rejected under such section."  11 U.S.C. § 1123(b)(2).  Section 365, in turn, provides, "the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor," 11 U.S.C. § 365; and in

---

[6] The Bankruptcy Court held that Wild Waves was a party in interest under § 1121(b).  2010 Bankr. LEXIS 1642 at *20-21. Nickels does not appeal that ruling.

a chapter 11 case, this same power is extended to a debtor in possession.  *See* 11 U.S.C. § 1107(a) ("Subject to [certain limitations and exceptions] . . . a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee.").  Thus, Nickels reasons, by expressly identifying trustees and debtors in possession, the Code *exclusively* grants them the power to assume. Since it is beyond dispute that Wild Waves is neither a trustee or the debtor in possession, Nickels concludes that Wild Waves' Plan may not provide for assumption of the Sale Agreement.

Nickels cites three cases in support of its argument.

In *Affordable Efficiencies, Inc., et al. v. Bane, et al., (In re: Bane)*, the bankruptcy court held that an unexpired lease had been automatically rejected pursuant to 11 U.S.C. § 365(d)(4).[7]  228 B.R. 835, 839-41 (Bankr. W.D. Va. 1998).[8]  The debtor argued that by accepting lease payments for over a year, and failing to seek to compel the debtor to assume or reject the lease, the lessor should be estopped from arguing that the lease was automatically rejected by operation of law.  *Id.* at 41.  The

---

[7] ". . . if a Trustee does not assume or reject an unexpired lease of nonresidential real property . . . within 60 days after the date of the order fo relief . . . then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor."  11 U.S.C. § 365(d)(4).

[8] *Aff'd on other grounds by* 182 F.3d 906 (4th Cir. 1999).

bankruptcy court disagreed because "the lessor, by its actions cannot waive the right of the Trustee." *Id.* In support of this conclusion, the bankruptcy court cited § 365(d)(4), and stated, "the statute provides the right to the Trustee, and no other party, to assume or reject." *Id. Affordable Efficiencies* did not hold that a creditor / plan proponent cannot assume an executory contract between it and the debtor in possession, it merely held that the lessor was not estopped from arguing that the unexpired lease at issue was automatically rejected.

*Continental Country Club, Inc. v. Burr (In re Continental Country Club, Inc.)* did hold that only a trustee or debtor in possession could assume or reject an executory contract, but the bankruptcy court came to that conclusion without any analysis, and the holding was one of two alternate, independent holdings. 114 B.R. 763, 765-67 (Bankr. M.D. Fla. 1990).

Likewise, in *In re: Valley View Shopping Center, L.P.*, the bankruptcy court held, without analysis, that a creditor / plan proponent could not require a debtor to assume an unexpired lease. 260 B.R. 10, 39 (Bankr. D. Kan. 2001). Also, as in *Burr*, the holding was one of two alternate, independent holdings. *See id.* at 39-40.

On the other hand, Wild Waves relies on *In re Dynamic Tooling Systems, Inc.*, which holds that "a creditor's plan proponent may provide for an estate representative to assume or

7

reject an executory contract." 349 B.R. 847, 852 (Bankr. D. Kan. 2006). The bankruptcy court explained:

> here, a creditor has filed a plan that materially complies with the mandatory requirements of § 1123(a) and contains some of the discretionary provisions permitted by § 1123(b). If, as [the opposition] seems to say, a creditor-proponent could not provide in a plan for a plan representative to assume or reject executory contracts, the practical results would be nonsensical. Section 1123(b)(2) would have no meaning in connection with creditors' plans. A creditor proponent would either have to rely upon the debtor, its obvious adversary, to reject any unfavorable or burdensome contracts or the creditor would need to seek the appointment of a trustee in the case, triggering an additional layer of administrative expense and effort in order to propose a liquidation or other alternative to what the debtor has offered the creditor body. The tactical value of a creditor's right to file a plan under § 1121 would be diminished.

*Id.* at 853.[9]

---

[9] The text of 11 U.S.C. § 1142, governing "[i]mplementation of [the] plan," provides further contextual support for *Dynamic Tooling's* conclusion. That section provides, "(a) . . . the debtor . . . shall carry out the plan and shall comply with any orders of the court. (b) The court may direct the debtor . . . to execute or deliver . . . any instrument required to effect a transfer of property dealt with by a confirmed plan . . . that is necessary for the consummation of the plan." § 1142(a)-(b). Collier on Bankruptcy explains:

> Section 1142(a) directs the debtor to carry out the terms of the confirmed plan. . . . While these provisions are arguably superfluous in light of the statement in section 1141(a) that the plan binds the debtor, any entity issuing securities under the plan, and any entity acquiring property under the plan, section 1142(a) makes clear the legal obligation of the debtor to carry out the terms of the confirmed plan and obviates the need for the court to specifically direct the debtor to do so. *This clear statement of the debtor's obligation is particularly helpful in those cases where the debtor was*

8

The bankruptcy court went on to implicitly reject the argument that Nickels asserts here: that § 1123(b)(2), by referencing § 365, expressly limits the power of assumption to the trustee and debtor in possession. According to the *Dynamic Tooling* court, "[s]ection 1123(b)(2)'s language that subjects contract assumption or rejection to § 365 insures that the court has the opportunity to approve the proposed assumption or rejection." 349 B.R. at 853.

The Court finds *Dynamic Tooling's* reasoning persuasive and adopts it, just as the Bankruptcy Court did.[10] Accordingly, this Court holds that Wild Waves' Plan does not violate § 1123(b)(2). The Bankruptcy Court's decision on this issue will be affirmed.

**B.**

Next, Nickels argues that the Bankruptcy Court erred in concluding that the Sale Agreement contemplated a reduction of

---

> *not the plan proponent.* . . .
>
> Section 1142(b) empowers the court to direct the debtor . . . to execute or deliver . . . any instrument required to effect a transfer of property dealt with by a confirmed plan. . . .

8-1142 Collier on Bankruptcy ¶¶ 1142.02 - 1142.03 (emphasis added). Thus, § 1142 provides a clear statutory directive that the debtor must comply with a party in interest's confirmed plan-- and thus must assume or reject an executory contract-- even if it would not do so if its own plan were confirmed.

[10] *See In re: Nickels Midway Pier, LLC,* 2010 Bankr. LEXIS 1642 at *23-28 (Bankr. D.N.J. 2010).

the original $5.5 million purchase price in the event of a partial, but not total, destruction of the Pier.[11] Alternatively, Nickels argues that even if reduction of the purchase price was proper, the Bankruptcy Court's method for calculating the reduced purchase price was incorrect.  The Court addresses each argument in turn.

**(1)**

With respect to the purchase price issue, the relevant provisions of the Sale Agreement provide:

    12. Risk of Loss

    (a)    The risk of loss or damage to the property by fire or otherwise, excepting ordinary wear and tear, is on the Seller until the closing.  If damage by fire shall exceed ten percent (10%) of the purchase price, Buyer may cancel this Agreement.

    (b)    Until Closing, Seller shall add Buyer as an additional insured under its Property Damage Policy . . .

. . .

    21. General

. . .

    (d)    Buyer reserves the right, at its sole discretion, to purchase the property irrespective of any breach of this Agreement by Seller, any failure of Seller to perform any of its duties or

---

[11] As noted in various other opinions, a fire on the Pier destroyed the Castle and Dungeon amusement attraction, the largest income producing structure on the Pier.

>
> obligations under the agreement, any defect in title or any environmental or other deficiency in the property.
>
> (e) In the event of a fire that results in total destruction of the structures on the property, Buyer shall have the right to purchase the property at the value allocated to the real estate in Paragraph 2(f).[12]

The issue is: what was the parties' intent as to Wild Waves' contractual "remedies" in the event of damage to more than 10%, but less than 100%, of the structures on the Pier? Nickels argues that Wild Waves has two options under the contract: cancel the Agreement pursuant to paragraph 12(a), or pay the entire $5.5 million purchase price. Wild Waves argues, and the Bankruptcy Court held, that the contract gives Wild Waves the right to purchase the property at a reduced price.

The Court concludes that the Bankruptcy Court did not err. Nickels' argument cannot be reconciled with Paragraph 21(e), which provides that in the event of 100% destruction of the structures (i.e., more than 10% damage), Wild Waves shall have a remedy *other than* cancellation or purchase at the full contract price, namely, purchase at a reduced price. Stated another way, considering all the possible outcomes in the event of damage, Nickels' proposed interpretation of the contract would yield an anomalous result. According to Nickels, Wild Waves agreed to pay

---

[12] The Sale Agreement contains no Paragraph 2**(f)**; Paragraph 2(e) values the real estate at $ 2 million.

11

the full purchase price even if more than 50% of the structures were damaged, so long as the damage was not 100%, in which case Wild Waves would then pay for the land only.

The Court finds the Bankruptcy Court's approach to interpreting the parties' agreement to be entirely consistent with New Jersey law regarding construction of real estate contracts:

> The general purpose of the agreement is to be considered in ascertaining the sense of particular terms. The design of the parties to a written contract is to be collected from the instrument as an entirety. And the writing is to have a reasonable construction. Disproportionate emphasis upon a single provision does not serve the purpose of interpretation. Words, phrases and clauses are not to be isolated but related to the context and the contractual scheme as a whole, *and given the meaning that comports with the probable intention.* The literal sense of the terms may be qualified by the context. The significance of a particular part of the writing is determined by a consideration of all its parts. It is the revealed intention that is to be effectuated. In a word, the standard of interpretation is *the meaning that would be attached to the integration by a reasonably intelligent person.* And, in the quest for the common design, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain, are to be regarded.

*Coolidge & Sickler v. Regn*, 7 N.J. 93, 99 (1951)(internal citation and quotation omitted)(emphasis added).

In this case the Bankruptcy Court considered the entire Sale Agreement, as well as the "situation of the parties [and] the attendant circumstances," to give the contract a "reasonable construction." *Id.* The "practical," *id.*-- and in this Court's

view, correct-- result was a holding that the parties intended Wild Waves to have the right to purchase the Pier at a reduced price.

**(2)**

The Bankruptcy Court calculated the reduced price by adding the value of the remaining improvements on the Pier to the value of the land (i.e., $2 million according to the Sale Agreement), thereby arriving at a purchase price of approximately $3.06 million.

Nickels argues that the Bankruptcy Court should have used the 2009 fair market value-- which Wild Waves' own expert stated was $5 million-- as the purchase price. But the Court agrees with Wild Waves that using the fair market value does not appropriately take into account the fact that Nickels retained $3 million of insurance proceeds after the fire. Wild Waves argues, and this Court agrees, it would be unreasonable (and therefore not the probable intention of the parties) to allow Nickels to recover a total of approximately $8.5 million (the Sale Agreement's purchase price of $5.5 million plus the insurance proceeds), while in exchange, Wild Waves would own the Pier without its largest income producing structure (the Castle and Dungeon).

On the other hand, the Bankruptcy Court's method of

calculation does, in effect, account for Nickels' receipt of the insurance proceeds.  By adding the value of the real estate ($2 million per paragraph 12(e)) to the value of the remaining structures, Wild Waves pays for what it receives (the Pier and the remaining structures), while Nickels receives / retains that to which it is entitled (the reduced purchase price and the insurance proceeds).  As both the Court and Wild Waves observed at oral argument, such an approach is entirely consistent with Paragraph 12(a) of the Sale Agreement which places the risk of loss on Nickels until closing.[13]

The Court holds that the Bankruptcy Court's method for calculating the reduced purchase price is supported by a reasonable interpretation of the Sale Agreement.  The Bankruptcy Court's decision in that regard will be affirmed.

---

[13]  At common law in New Jersey, the doctrine of equitable conversion applies; i.e., upon execution of a contract for the sale of real estate, the buyer assumes the risk of any loss that may occur before title passes. *Coolidge & Sickler v. Regn*, 7 N.J. 93 (1951).  However, the parties to the contract may expressly provide to the contrary in their sale agreement, *id.*, as Nickels and Wild Waves did in this case.
  Reducing the purchase price is the logical result of the parties' agreement to place the risk of loss on Nickels.  If there were no reduction of the purchase price upon the occurrence of a loss, there would be no "risk" to assume-- Nickels would be entitled to the full contract price even in the event of a loss.  Because Nickels had the risk of loss, it had the insurable interest, and was thus entitled to the insurance proceeds.

14

C.

Nickels also argues that the Bankruptcy Court erred in concluding that the Nickels Brothers were unimpaired under the Bankruptcy Code, and therefore not entitled to vote on Wild Waves' Plan.

Section 1124 provides, "a class of claims or interests is impaired unless, with respect to each claim or interest of such class, the plan-- (1) leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124(1).  "Under 11 U.S.C. § 1124(1), the presumption of impairment is overcome only if the plan leaves unaltered the [interest holder's] legal equitable, and contractual rights."  *In re PPI Enterprises*, 324 F.3d 197, 203 (3d Cir. 2003) (internal citation and quotation omitted).

Nickels does not dispute that the Nickels Brothers "will retain their equity interests and will receive a distribution in the event there are funds available from the liquidation of the Debtor's assets after payment of all creditors."  (Nickels' Brief, p. 20; see also Pa34)  But Nickels asserts that the Plan impairs the Nickels Brothers because it undisputedly provides that property of the estate will remain property of the estate rather than revesting in the Debtor, and the Plan Administrator will manage the estate.  While the Plan does provide that the

15

Nickels Brothers will continue the "management of the Debtor's operations" (Pa37), Nickels asserts that as a practical matter, there will be no operations of the Debtor post-confirmation.

The "impairments" Nickels asserts the Plan imposes do not alter the Nickels Brothers' "legal, equitable [or] contractual rights," 11 U.S.C. § 1124(1), as equity holders. Therefore, the Bankruptcy Court did not err in concluding that the Nickels Brothers were unimpaired under the Plan. The Bankruptcy Court's holding in this regard will be affirmed.

### D.

Lastly, Nickels argues that the Plan violates 11 U.S.C. § 1122 by placing Wild Waves in a class of its own (Class 5). According to Nickels, Wild Waves is merely an unsecured creditor that belongs in the class consisting of all other general unsecured creditors (Class 4).

The statute provides, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

The plain language of § 1122 only requires similarity of claims *within* a given class. As Wild Waves is the only creditor in its class, it cannot be dissimilar from any of the other class members because there are none. Nor does § 1122 require that

16

similar claims be placed in the same class; the use of "may" clearly indicates that grouping of similar claims is permissive, not mandatory. Thus § 1122 also does not require that Wild Waves be placed in any of the other classes of the Plan. Section 1122 merely states that *if* Wild Waves is placed in a class with other creditors, Wild Waves' claim must be "substantially similar" to the other creditors' claims.

Indeed, in considering the language of the statute, the Third Circuit has held, "we agree with the general view which permits the grouping of similar claims in different classes," but added that, "classification of the claims or interests must be reasonable;" not "arbitrary." *In re: Jersey City Medical Center*, 817 F.2d 1055, 1061 (3d Cir. 1987). The Court explained that without a reasonableness requirement, a plan proponent could improperly gerrymander classes:

> There must be some limit on a debtor's power to classify creditors in such a manner to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*In re: Jersey City Medical Center,* 817 F.2d at 1061 (internal citation and quotations omitted); *see also John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,* 987 F.2d

17

154, 158 (3d Cir. 1993) ("the Code was not meant to allow a debtor complete freedom to place substantially similar claims in separate classes.  The critical confirmation requirements set out in Section 1129(a)(8) (acceptance by all impaired classes) and Section 1129(a)(10) (acceptance by at least one impaired class in the event of a 'cram down') would be seriously undermined if a debtor could gerrymander classes.").

Thus, the issue is whether Wild Waves *reasonably* placed itself in a class of its own.  The Bankruptcy Court concluded the placement was reasonable, observing, "Wild Waves has agreed to subordinate its unsecured claim and receive payment after the unsecured creditors of Class 4 and the Plan Administrator Loan are paid in full."  2010 Bankr. LEXIS 1642 at *23.  It also concluded that Wild Waves had not "creat[ed] multiple classes to mold the vote."  *Id.*

This Court agrees with the Bankruptcy Court's conclusions.  The critical difference between this case and *John Hancock,* where the classification scheme was held unreasonable, is that, as set forth above, Wild Waves has consented to subordinate its claim to all other creditors.  *Contrast John Hancock Mutual Life Insurance Co.,* 987 F.2d at 156 ("Class Three was made up of all the unsecured claims other than Hancock's. . . . Class Four consisted of Hancock's unsecured claim. . . . The plan called for identical payments on the Class Three and Four claims.").  Thus, placing

Wild Waves in a separate class was reasonable and not arbitrary. Accordingly, the Bankruptcy Court's decision on this issue will be affirmed.

### IV.

For the reasons set forth above, the Bankruptcy Court's Order Confirming Wild Waves' Third Modified, First Amended Plan for Liquidation will be affirmed. The Court will enter an appropriate order.

Dated: April 25, 2011         s/ Joseph E. Irenas
                                         JOSEPH E. IRENAS, S.U.S.D.J.